UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

EUGENE MARTIN MCCUMONS,

        Plaintiff,

                                        Case Number 08-11164-BC
v.                                            Honorable Thomas L. Ludington

J. MAROUGI, *Officer*, *et al.*,

        Defendants.

_____/

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT MAROUGI'S MOTION FOR SUMMARY JUDGMENT

On March 18, 2008, Plaintiff Eugene Martin McCumons filed a complaint, alleging that Defendant Officer J. Marougi violated Plaintiff's constitutional rights when he effectuated an arrest of Plaintiff and seized his vehicle. Dkt. # 1, 24. The underlying incident occurred at a public park on August 10, 2007, when Defendant arrested Plaintiff for "accost[ing], solicit[ing], or invit[ing] another person in a public place or in or from a building or vehicle, by word, gesture, or any other means, to commit prostitution or to do any other lewd or immoral act . . . ." Mich. Comp. Laws § 750.448. Pursuant to 42 U.S.C. § 1983, Plaintiff alleges violation of his constitutional rights under the First, Fourth, and Fourteenth Amendments.

On December 29, 2008, Defendant requested summary judgment with respect to each of these claims, asserting qualified immunity. For the reasons discussed below, the Court will **GRANT** in part and **DENY** in part Defendant's motion for summary judgment.

I

Plaintiff is a homosexual male that alleges he was targeted by police because of his sexuality. A public-school teacher and resident of Saginaw, Michigan, Plaintiff operated a booth at a flea

market on some weekends with his partner. The flea market was located in Pontiac, Michigan, which is approximately eighty miles south of Saginaw. The flea market was situated near Hawthorne Park, a typical city park with a playground, grass and wooded areas, and parking lots.

Defendant emphasizes that people have engaged in a wide variety of public sexual activity in Hawthorne Park for years. Consequently, the Pontiac Police Department initiated an undercover operation to combat sexual conduct occurring in the park. For example, Defendant's motion highlights six arrests related to explicit sexual conduct between December 8, 2006 and August 3, 2007. Indeed, Plaintiff acknowledges engaging in consensual sexual activity in Hawthorne Park on prior occasions.

On August 10, 2007, Plaintiff drove from Saginaw to Pontiac to attend the flea market. Before proceeding to the flea market, however, Plaintiff visited Hawthorne Park. On that Friday afternoon, Defendant was undercover, seated in a vehicle in a horseshoe-shaped parking lot at Hawthorne Park. According to the amended complaint, Plaintiff arrived at Hawthorne Park, parked his car, and changed his shirt. *See generally* dkt. # 24. Defendant drove his vehicle past Plaintiff, stopped his vehicle to make eye contact with Plaintiff, and then pulled away. A few minutes later, Defendant again drove by Plaintiff's parked vehicle. Plaintiff then drove near Defendant's parked vehicle and said, "Hello," which initiated a conversation between the two. The amended complaint describes the interaction as follows:

> In the course of flirting, Plaintiff said he was "taking it easy" and [Defendant] said something about making it a "better day." Plaintiff asked what that "would be like" and the officer asked [P]laintiff what he ([P]laintiff) "liked." Plaintiff asked [Defendant] what [Defendant] "liked" and the officer answered "everything but it." [Defendant] asked Plaintiff what he liked and [P]laintiff replied that he "liked it all too."
>
> [Defendant] said "I do oral."

> At no time did [P]laintiff say anything about what he "would do" nor did he saying [sic] anything about what he would like [Defendant] to do. There was no offer or request for a sexual act of any kind.
>
> [Defendant]'s report claims that defendant said "he wants to feed me his load." Assuming [Defendant] means that Plaintiff said "I want to feed you my load" Plaintiff says that claim is false. Even if true, the reported statement does not constitute solicitation.
>
> Plaintiff responded to [Defendant's] statement that [Defendant] did "oral" by saying "I don't have anywhere we can go."
>
> [Defendant] volunteered that "we can go to the back" which [P]laintiff understood as an invitation to get into the back of [Defendant's] Yukon SUV. Plaintiff said "I don't know" and made no move to act on [Defendant's] invitation. He never got out of his own vehicle, or even turned off the engine.
>
> [Defendant] responded to Plaintiff's rejection by saying "Come on. Let's go. I've only got about ten minutes before I've got to get to work. You know how that goes."
>
> Plaintiff replied "I need to think about it. I'll let you know."
> [Defendant] responded by insisting that [P]laintiff "make up your mind." He then suggested "we can go back" and [P]laintiff could park and enter [Defendant's] vehicle. He assured [P]laintiff that "if anyone comes you can just get out." He urged Plaintiff to follow him "back there."
>
> Plaintiff again said "I don't know." He then asked [Defendant] "Why? Are you horny?" [Defendant] answered "why do you think I'm here?"
>
> [Defendant] then drove forward and Plaintiff continued around the traffic circle. [Defendant] then turned around and drove at an angle toward Plaintiff. Plaintiff rolled down his passenger window part way and told [Defendant] that [Plaintiff] had seen a police car (on Telegraph [Road]) and he was, therefore, going to leave.
>
> Plaintiff had seen no such police car, but concocted an excuse to disengage from [Defendant] without offending him or explicitly rejecting him.
>
> Plaintiff drove out of the park at a normal rate of speed, and hesitated an unusually long time at the exit to observe a disabled car. Another car was approaching at a considerable distance behind him, but it was not [Defendant], and Plaintiff left the park.

*Id.* at ¶¶ 18-30. At his deposition, Plaintiff provided the following description of the interaction with

Defendant:

> I pulled into the park. . . I was in the circle, I noticed – I changed my shirt, I was off to the side and moved around the circle and there were three or four cars parked together on one of the trails. I went down there, I turned around on one of the trails. I went down there, I turned around, stopped, pulled back in away from them because I didn't want to be around them, and I was sitting there and that's when [Defendant] came by me.
>
> When he went by, he nodded and I nodded back. He pulled on ahead a little bit next to some of those cars then, so he was in that bunch of cars. I didn't want to get blocked in if there were another car that came in so I pulled out and went around the opposite way and back around the circle, went down to the other part of the park and then went over to the pond area . . . Probably took maybe, seven, ten minutes and [Defendant's] vehicle came down, around the pond and then crossed in front of me where I was parked, and he looked again.
>
> He went back up toward[s] the front of the park and I did not follow him at that time . . . I moved up and went back up the hill in the secluded part of the park . . . up the hill as I'm going I notice that he is parked at the top of [the] hill. That's when he is parked there. As he is parked on one side off on the side of the road, I come up and we are a distance apart but I am still on the road. I stopped and that is when I said hello. He's sitting there, I said hello. He said How you doing. At that point is when the conversation starts.
>
> \* \* \*
>
> I stopped and that is when I said hello. He's sitting there, I said hello. He said How are you doing. At that point is when the conversation starts.
>
> \* \* \*
>
> I said How are you doing. He said Doing all right, how about you. I'm fine. He made allusion to the – he said something with the words Well, what would make it a better day? I said I don't know what you mean. He said Well, you know what I mean. That was that flirting that went on. I can't give you exact but it's like you were at a function, an activity. You're there, I don't care if it's a bar, I don't care if it's a friend's house. So I am talking with him.
>
> At some point he said Well, what's going on and I said I don't know, what are you – what's up. Just those facts of flirting. Said Well, what are you looking for, I don't know. You do all that type of thing. At one point he then said Well, you know, I like everything. I said What do you mean. I like everything but it. Those were the words he used. I'm going It, what's it. You know. As he said what do you like. I

-4-

> like everything, you know…
>
> He said well, at that point I got to get going or I got to go to work, you know how that is. I said Yeah, I do, and I thought that was strange also. At that point he said, you know, Let's go back to the back. Nothing – let's go back to the back. I said where and he was facing, and he went back to the back over his shoulder.
>
> * * *
>
> He said Come on, you can get in my truck, no one will see us. I said Let me think about it. So I decided to drive away and then I made a funny comment of Why, are you horny, and he said Why do you think I'm here, and I said okay. Not okay to anything.
>
> * * *
>
> So I started driving around because I got to come back around to go down the hill. You have to go around the circle because there is all tall grass where he is at and I have a low riding vehicle. It bottoms out. So I started driving around. He quickly drives around towards the back also, going from the other way, and he drives off into the high grass. I'm not going to get into the high grass so I keep going, I stop and lean over and I roll down my passenger's window and he comes up on an angle and I said I got to get going, I saw a police officer over there.
>
> * * *
>
> At that point I said I got to get going and I drove away.

Dkt. # 27-2 at 32-33.

> Defendant's report described the incident as follows:
>
> [A]round 3:15 p.m. I was parked up top in Hawthorne Park . . . about twenty minutes when a blue Pontiac Sunfire pulled up next to me . . . [Plaintiff] asked me what I was doing and I told him nothing just sitting here . . . [Plaintiff] told what [sic] I wanted to do because he wants to feed me his load. [Plaintiff] then stated to me you know what I mean. I told him that it sounds good to me. [Plaintiff] then asked me if he could get in my truck to do that. I told him sure follow me to the back of the park so nobody could see our cars. [Plaintiff] then looked over to [another officer] and stated that's the police.

Dkt. # 15-11 at 1. Plaintiff disputes that he made some of the statements in the report or requested

to get into Defendant's vehicle.

-5-

In any event, shortly after departing Hawthorne Park, Plaintiff was detained for about fifteen minutes by plain-clothes officers at a nearby flea market, but released pending further investigation. The police also seized his vehicle and instructed him to call the department. Dkt. # 15-10 at 7. After detaining Plaintiff at the flea market, Defendant "advised [Plaintiff] that [he] would be seeking a warrant for solicitation . . . [and] that the park was for kids to play and these types of acts needed to stop in the park." Dkt. # 15-11 at 1. According to Plaintiff, Defendant told Plaintiff that he made Defendant "sick" while arresting him.

With respect to the seizure of Plaintiff's vehicle, Defendant issued paperwork referencing Mich. Comp. Laws § 333.7104, which is a statutory provision concerning controlled substances. Michigan law authorizes the seizure of a vehicle "used for the purpose of lewdness, assignation or prostitution . . . ." Mich. Comp. Laws § 600.3801. The vehicle was impounded for three days.

A few weeks later, an arrest warrant was issued and Plaintiff voluntarily appeared at the department after being summoned by police. Plaintiff was arraigned for violating Mich. Comp. Laws § 750.448, which prohibits a person from "accost[ing], solicit[ing], or invit[ing] another person in a public place or in or from a building or vehicle, by word, gesture, or any other means, to commit prostitution or to do any other lewd or immoral act . . . ." The criminal charges were ultimately dismissed without prejudice.

II

A motion for summary judgment under Federal Rule of Civil Procedure 56 presumes the absence of a genuine issue of material fact for trial. Under Rule 56(c), a court must review "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to conclude that "there is no genuine issue as to any material fact and that the

moving party is entitled to a judgment as a matter of law." The Court must view the evidence and draw all reasonable inferences in favor of the non-moving party and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact. *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527, 534 (6th Cir. 2002).

The party opposing the motion then may not "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must make an affirmative showing with proper evidence in order to defeat the motion. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989). A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252."[T]he party opposing the summary judgment motion must 'do more than simply show that there is some "metaphysical doubt as to the material facts."'" *Highland Capital, Inc. v. Franklin Nat. Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### III

The principal argument advanced by Defendant's motion is that he is entitled to qualified immunity with respect to each of Plaintiff's causes of action for violation of his constitutional rights. "Qualified immunity provides 'that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 900 (6th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 815 (2009). Qualified immunity shields mistakes based on questions of law or fact. *Id.*

In determining whether qualified immunity is applicable, the Court must decide whether "based upon the applicable law, the facts viewed in the light most favorable to the plaintiffs show that a constitutional violation has occurred" and "whether the violation involved a clearly established constitutional right of which a reasonable person would have known." *Champion*, 380 F.3d at 901 (quoting *Feathers v. Aey*, 319 F.3d 843, 848 (6th Cir. 2003)). Recently, the Supreme Court abolished the requirement that a district court must first analyze whether a constitutional violation occurred. *Pearson*, 129 S.Ct. at 818-19. In the event that Plaintiff has demonstrated a violation of a clearly established constitutional right, the Court must then decide "whether the plaintiff has offered sufficient evidence to indicate that what the official allegedly did was objectively unreasonable . . . ." *Champion*, 380 F.3d at 901 (quoting *Feathers*, 319 F.3d at 848). In this Circuit, the burden rests with the plaintiff to demonstrate that a defendant is not entitled to qualified immunity. *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (citing *Gardenshire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000)). Defendant's assertion of qualified immunity shall be evaluated against each claim.

A

i

Plaintiff alleges that his detainment after the interaction, the seizure of his vehicle, and false statements in the police report each violated his Fourth Amendment rights to be free from unreasonable seizure. Defendant concedes that it is clearly established that, in this circumstance, the seizure of Plaintiff and his vehicle needed to be supported by probable cause. For the purpose of this motion, Defendant concedes that probable cause did not exist. Rather, Defendant argues that, based on Plaintiff's description of events, Defendant had an objectively reasonable basis to conclude that probable cause did exist to arrest Plaintiff and seize his vehicle, although ultimately incorrect.

In the context of an unlawful arrest, the inquiry is whether "a reasonable officer could have believed [the arrest] to be lawful, in light of clearly established law and the information the [the officer] possessed." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)). Qualified immunity, however, protects a reasonable mistake that " 'at the moment the arrest was made . . . the facts and circumstances within [the arresting officer's] knowledge . . . [was] sufficient to warrant a prudent man in believing' that the plaintiff had violated [the law]." *Id.* (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *see also Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (characterizing inquiry as whether officer had "arguable" probable cause). An officer is not entitled to qualified immunity if the record, viewed in the most favorable light to the plaintiff, is able to support the conclusion that the officer's belief that probable cause existed was not objectively reasonable. *Parsons v. City of Pontiac*, 533 F.3d 492, 501 (6th Cir. 2008).

Here, Plaintiff was detained and later criminally charged for violating Mich. Comp. Laws

§ 750.448. It is undisputed that Plaintiff's recollection of the interaction discussed "lewd" or "immoral" conduct as contemplated by the statute. Indeed, the record viewed in a light most favorable to Plaintiff supports the conclusion that it was objectively reasonable for Defendant to conclude that this element was satisfied.

On the other hand, Plaintiff's version of the facts does not present a reasonable predicate to conclude that Plaintiff "solicited" or "invited" Defendant to engage in such behavior. The statute is violated when a person, "through words or conduct, invites another to perform an immoral act." *People v. Marby*, 301 N.W.2d 528, 529 (Mich. Ct. App. 1980). Plaintiff acknowledges that he initiated verbal communication and engaged in "flirtatious behavior." Reviewing the allegations in the complaint and Plaintiff's testimony, only one interchange might arguably be construed as Plaintiff soliciting or inviting lewd conduct as opposed to discussing such conduct, listening to a discussion about such conduct, or responding to Defendant's solicitation or invitation. Plaintiff testified that he asked Defendant if Defendant "was horny," to which Defendant responded "Why do you think I am here?" Plaintiff replied by stating "okay." This interchange does not demonstrate that Plaintiff extended an invitation particularly in the context of the parties' carefully crafted discussion. In fact, the balance of Plaintiff's version of events demonstrates that Defendant repeatedly propositioned Plaintiff.

Defendant argues that the proper inquiry is "whether[] it was contemplated that a sexual act was going to take place right there in the park, somewhere else in the park, or elsewhere." Dkt. # 15 at 25. According to Defendant, he believed probable cause existed when "a sexual act was discussed contemplating the same taking place in the park." *Id.* To accept that view, however, would be to read out of the statute the language requiring that a perpetrator initiate the speech by

"accost[ing], solicit[ing], or invit[ing]" another to commit a lewd act. The effect of such a conclusion would be to criminalize listening to a proposition to engage in lewd behavior in a public place.

Defendant also argues that he maintained a reasonable belief that probable cause based on Plaintiff's "gestures and other means to communicate intent." *Id.* By driving towards an area that suggested by Defendant, Defendant asserts that Plaintiff expressed an intent to "follow [Defendant] to the other location for consummation of the act." While non-verbal conduct could be a predicate for solicitation or invitation, Plaintiff testified that Defendant suggested that they "go back to the back" and invited Plaintiff to "get in [Defendant's] truck." At that point Plaintiff drove around the horseshoe parking lot, but did not follow Defendant to the suggested rendezvous location. Plaintiff's testimony demonstrates that Defendant extended multiple invitations, and, at best, Plaintiff's conduct could be construed as accepting the invitation.

Ultimately, the record viewed in a light most favorable to Plaintiff demonstrates that it was not objectively reasonable to conclude that Plaintiff violated Mich. Comp. Laws § 750.448 Notwithstanding that conclusion, Defendant's version of events contains allegations that establish an objectively reasonable belief that probable cause existed. This evidentiary conflict requires a jury to evaluate the competing versions of the discussion. Consequently, Defendant is not entitled to qualified immunity with respect to his decision to arrest Plaintiff.

Similar reasoning compels the Court to conclude that the seizure of the vehicle is not shielded by qualified immunity. Michigan law permits law enforcement to impound a vehicle "used for the purpose of lewdness." Mich. Comp. Laws § 600.3801. Just as the record viewed most favorably to Plaintiff does not indicate that he solicited or invited Defendant to engage in lewd conduct, neither does it provide a basis to conclude that Plaintiff "used" his vehicle "for the purposes

of lewdness." It is undisputed that sexual activity did not occur, inside of or outside of the Plaintiff's vehicle. Defendant did not have an objectively reasonable basis to conclude that Mich. Comp. Laws § 600.3801. applied, and he is not entitled to qualified immunity with respect to seizure of the vehicle.

Notwithstanding that conclusion, Plaintiff's pleadings alternatively argue Defendant violated the Fourth Amendment by referencing an inapplicable statutory provision on the paperwork documenting the seizure. While the paperwork does reference a narcotics-related statute, the record demonstrates that Defendant concluded, while perhaps erroneously, that Plaintiff violated Mich. Comp. Laws. § 750.448. Plaintiff has not offered any authority that it is a clearly established constitutional right that such paperwork must be free from procedural defects. Defendant is entitled to qualified immunity under this alternative theory.

ii

In addition, Plaintiff asserts Defendant violated his Fourth Amendment rights by representing in the police report that Plaintiff told Defendant that he wanted to "feed him his load" and asked permission to enter Defendant's vehicle. Plaintiff asserts that the inclusion of this statement led to his later arrest and prosecution. "This Circuit has held that alleging prosecution based upon an officer's having 'fabricated evidence and manufactured probable cause' is sufficient to state a claim of malicious prosecution under the Fourth Amendment." *McGuire v. City of Royal Oak*, 295 F.App'x 736, 739 (6th Cir. 2008) (quoting *Spurlock v. Satterfield*, 167 F.3d 995, 1005-06 (6th Cir.1999) and citing *Adams v. Metiva*, 31 F.3d 375, 388-89 (6th Cir.1994) (sustaining a malicious prosecution action where police had allegedly supplied false information)). An officer does not act in an objectively reasonable manner when he "fabricates probable cause, thereby effectuating a

seizure." *Spurlock*, 167 F.3d at 1006.

Here, Defendant is not entitled to qualified immunity. Again, Defendant concedes that Plaintiff's version of the incident would not establish probable cause. Plaintiff alleges that Defendant fabricated statements in the police report that "[Plaintiff] told what [sic] I wanted to do because he wants to feed me his load . . .[Plaintiff] then asked me if he could get in my truck to do that . . . ." Dkt. # 15-11 at 1. Without those statements, the police report would not have established probable cause. Their inclusion led to the issuance of an arrest warrant and the attempted prosecution of Plaintiff. Plaintiff disputes the statements in the police report, asserting that they were fabricated. Defendant is not entitled to qualified immunity.

B

In Plaintiff's view, "an invitation to have private sex is constitutionally protected" by the First Amendment and Defendant is not entitled to qualified immunity. Dkt. # 27 at 17. Indeed, it is objectively unreasonable for a police officer to arrest a person for engaging in protected speech. *See Logsdon v. Hains*, 492 F.3d 334, 346 (6th Cir. 2007). To garner protection of the First Amendment, a plaintiff must demonstrate that he engaged in protected conduct, the government conduct "would deter a person of ordinary firmness from continuing to engage in that conduct," and a causal connection between the two. *Tucker v. City of Richmond*, 388 F.3d 216, 220 (6th Cir. 2004) (quoting *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc)).

i

For the purpose of his motion, Defendant concedes that Plaintiff engaged in protected conduct. Dkt. # 15 at 28 n.7. In addition, it is undisputed that an arrest is an adverse action capable of deterring one's exercise of free speech rights. This element is satisfied.

Finally, if the plaintiff raises an inference that the defendant's conduct was partially motivated by the plaintiff's protected activity, the burden shifts to the defendant to demonstrate that it would have taken the same action regardless of the protected activity. *Walters v. Stafford*, 2009 WL 692164, \*7, 2009 U.S. App. LEXIS 5642, \* 22 (6th Cir. 2009) (citing *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007)). Plaintiff has testified that Defendant expressed an anti-homosexual viewpoint when arresting him. While Defendant contends that the arrest was "reasonable in response to the conduct he perceived," the facts as demonstrated by Plaintiff raises a connection between the content of the speech and Plaintiff's subsequent arrest. Moreover, it is clearly established the government may not suppress speech concerning sexual expression. *See Reno v. ACLU*, 521 U.S. 844, 874 (1997). Plaintiff has identified an alleged constitutional violation defeating Defendant's entitlement to qualified immunity.

C

Finally, Defendant contends that he is entitled to qualified immunity with respect to Plaintiff's claim under the Fourteenth Amendment. "The Equal Protection Clause prohibits the selective enforcement of laws based on arbitrary classifications." *Tatton v. City of Cuyahoga Falls*, 116 F. Supp. 2d 928, 935 (N.D. Ohio 2000) (citing *Stemler v. City of Florence*, 126 F.3d 856, 873-74 (6th Cir. 1997)). Indeed, "the desire to effectuate one's animus against homosexuals can never be a legitimate governmental purpose, a state action based on that animus alone violates the Equal Protection Clause." *Stemler*, 126 F.3d at 873-74. A prima facie claim for selective prosecution consists of the plaintiff demonstrating the following three requirements:

> First, [the state actor] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, he must initiate the prosecution

> with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Id.* at 873 (quoting *United States v. Anderson*, 923 F.2d 450, 453 (6th Cir.1991)(citing *Wayte v. United States*, 470 U.S. 598, 608 n. 10 & 609 (1985))). "[T]here is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; 'the standard is a demanding one.' " *Id.* (citing *United States v. Armstrong*, 517 U.S. 456, 465-66 (1996)). A plaintiff is "absolute[ly] requir[ed]" to identify persons outside of the group not prosecuted. *Id.*

In *Stemler*, the plaintiff alleged that officers prosecuted her for a crime because of her sexual orientation. *Id.* The court concluded that the plaintiff stated a claim for selective prosecution because the plaintiff identified a similarly-situated person from outside of her classification that law enforcement chose not to prosecute. *Id.*

Here, Plaintiff has not identified someone from outside of the class that Defendant decided not to prosecute. Rather, Plaintiff argues that this requirement is irrelevant in this context because the record is replete with evidence of anti-homosexual animus. Dkt. # 27 at 18-19. While Plaintiff disagrees with the high burden discussed in *Stemler*, he has not provided any authority that excuses the "absolute requirement" that Plaintiff make an affirmative showing that people from outside of the group were not prosecuted. Consequently, Plaintiff is unable to establish a constitutional violation for violation of the Equal Protection Clause and Defendant is entitled to qualified immunity.

IV

Accordingly, it is **ORDERED** that Defendant Marougi's motion for summary judgment [Dkt. # 15] is **GRANTED** in part and **DENIED** in part. Defendant Marougi is entitled to qualified

immunity with respect to Plaintiff's 42 U.S.C. § 1983 claim for violation of the Fourth Amendment with respect to defects in the documentation of the seizure of the vehicle and for violation of the Equal Protection Clause of the Fourteenth Amendment.

                                              s/Thomas L. Ludington
                                              THOMAS L. LUDINGTON
                                              United States District Judge

Dated: May 26, 2009

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on May 26, 2009.

                                      s/Tracy A. Jacobs
                                      TRACY A. JACOBS